# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF ALASKA

In re:

KEITH DAMON VAUGHN,

          Debtor.

Case No. A16-00076-GS
Chapter 7

## MEMORANDUM ON OBJECTION TO HOMESTEAD EXEMPTION

An evidentiary hearing on creditor Karen Montague's Objection to Homestead Exemption (ECF No. 15) was held on July 21, 2016. The court has considered the record herein and the testimony at the hearing. For the reasons stated below, the court will sustain the Objection, and disallow the debtor's homestead exemption.

**I.    Case Background.**

Debtor Keith Vaughn filed his chapter 7 petition on March 30, 2016. On his Schedule A/B, he listed an interest in property located at 51329 Inland Avenue, Kasilof, Alaska ("the Property"), with a value of $69,300.00.[1] Schedule A/B reflects that the debtor is the sole owner of this realty. It is described as a single family home, "gutted and in disrepair; $10,000 to clean and rehabilitate property." The debtor claims a homestead exemption in the Property under AS 09.38.010, which provides for a maximum homestead exemption of $72,900.00.

The debtor has very little in the way of personal property. However, Schedule A/B reflects that he receives "PERS monthly payments" of $2,941.00, and anticipates receipt of both a $2,500.00 tax refund and the 2016 Alaska PFD.[2] With the exception of the tax refund, these assets are also claimed exempt. According to the debtor's Statement of Financial Affairs, he receives SSI benefits totaling $25,642.00 annually, in addition to his monthly pension benefit.[3]

---

[1] Schedule A/B, ECF No. 1 at 10.

[2] ECF No. 1 at 13-14.

[3] *Id.* at 39.

The SSI benefit breaks down to $2,137.00 monthly. When combined with his PERS payment, the debtor receives $5,000.00 monthly.

The debtor has scheduled no priority or secured debt.[4] He listed his sister, Karen Montague, as a general unsecured creditor, holding a judgment for $60,000.00. The total of his scheduled, general unsecured claims is $161,216.00; this sum includes several credit card accounts, many "unsecured" auto loans and mortgages, and some medical debt.

Ms. Montague timely filed her Objection to Homestead Exemption ("Objection") on May 13, 2016. She argues that the debtor cannot claim a homestead exemption for the Property because he has not used it as his principal residence since July 11, 2014, when he deeded it to Wallace Hansen. The Property was deeded back to the debtor on July 31, 2015 after Ms. Montague posted a notice of foreclosure. She also asserts that the debtor filed his bankruptcy petition on the eve of a scheduled state court evidentiary hearing to determine whether the Property qualified as his homestead. She argues the transfers were made, and the bankruptcy petition was filed, to frustrate her foreclosure rights, and raise issues of "shenanigans" and fraudulent behavior on the debtor's part. Ms. Montague contends the homestead exemption should be disallowed so the chapter 7 trustee can sell the Property for the benefit of creditors of the estate.

## II.    Alaska Homestead Exemption.

The debtor claims a homestead exemption under applicable state law. The Alaska exemption laws "should be liberally construed in favor of the debtor."[5] Under AS 09.38.010(a), an individual may exempt as a homestead "the individual's interest in property in this state used as the principal residence of the individual or the dependents of the individual," up to a value of

---

[4] At the evidentiary hearing, the debtor stated that real property taxes are due for 2015 and 2016 on the Property. Yet, this obligation is not scheduled.

[5] *Ilardi v. Parker*, 914 P.2d 888, 890 (Alaska 1996)(citing *Gutterman v. First Nat'l Bank of Anchorage*, 597 P.2d 969, 972 (Alaska 1979)).

2

$72,900.00.[6]  It is undisputed that the debtor is an Alaska resident, and has an interest in the Property.  Determination of his claimed homestead exemption hinges on whether the Property has been used as his principal residence.

"Principal residence" is defined as "the actual dwelling place of an individual or dependents of the individual and includes real and personal property."[7]  The phrase "actual dwelling place" is the debtor's actual residence, meaning "no more than residence – true, substantial, and real; not fictitious, nominal, or pretended."[8]  It requires "actual occupancy on a regular basis; thus a distinction can be made between a home that is regularly occupied . . . and property [that the debtor uses] only as a vacation or weekend home."[9]  However, a debtor's temporary absences from a claimed homestead, even if "of substantial length, will not categorically result in residency forfeiture."[10]  While absence from a property does not necessarily preclude a finding of homestead, the Alaska Supreme Court has instructed that:

> The facts and circumstances of the absences should be considered in determining whether the exemption is lost.  The facts must show that no other residence of the debtor or the debtor's dependents is used or lived in with such regularity and consistency that the claimed residence cannot be found to be the debtor's primary residence or family home.[11]

---

[6] AS 09.38.010(a); 8 A.A.C. 95.030(a).

[7] AS 09.38.500(12).

[8] *Ilardi v. Parker*, 914 P.2d at 890-91 (quoting *Clarkson v. MFA Mut. Ins. Co.*, 413 S.W.2d 10, 14 (Mo. 1967)).

[9] *Id.* at 891.

[10] *Id.*; *see also Shumway v. Betty Black Living Tr.*, 321 P.3d 372, 376 (Alaska 2014)("continuous physical presence" is not required to establish entitlement to homestead exemption).

[11] *Ilardi v. Parker*, 914 P.2d at 891-92 (internal citation omitted).

3

When considering these circumstances, a debtor's conduct is weighted more heavily than his declarations of intent regarding the claimed homestead.[12] Generally, a debtor's declarations that are advantageous to the issue are "viewed with suspicion and accorded little weight."[13]

Because the debtor has filed bankruptcy, his entitlement to the homestead exemption is determined as of the date of the petition, under 11 U.S.C. § 541(a)(1).[14] The debtor has the burden of proving his entitlement to this exemption, by a preponderance of the evidence.[15]

## III.   The Debtor's Conduct with Respect to the Property.

### A.    Coincidental Timing of Property Transfers and Bankruptcy Filing.

Ms. Montague emphasized the coincidental timing of the debtor's transfers of the Property to, and from, Mr. Hansen, and the filing of his bankruptcy petition, with certain events pertaining to her prepetition collection efforts, as significant to the determination of the validity of the debtor's homestead exemption. The evidence reflects that a final judgment in the sum of $58,585.94 was entered against the debtor in a Washington state court probate proceeding on July 1, 2013 ("Judgment"), which was assigned to Ms. Montague on August 12, 2013.[16] The

---

[12] *Shumway v. Betty Black Living Tr.*, 321 P.3d at 376.

[13] *Kjarstad v. State*, 703 P.2d 1167, 1171 (Alaska 1985)(applied in context of determining domicile, rather than homestead).

[14] Under § 541(a)(1), a bankruptcy estate is created on the filing of the petition, and includes "all legal or equitable interests of the debtor in property as of the commencement of the case." *See also Diaz v. Kosmala (In re Diaz)*, 547 B.R. 329, 335 (B.A.P. 9th Cir. 2016)(quoting *Wolfe v. Jacobson (In re Jacobson)*, 676 F.3d 1193, 1199 (9th Cir. 2012)("bankruptcy exemptions are fixed at the time of the bankruptcy petition").

[15] AS 09.38.075(f)("The burden of proving the validity of an exemption by a preponderance of the evidence is upon the individual claiming the exemption."); *see also In re Diaz*, 547 B.R. at 337 ("where a state law exemption statute specifically allocates the burden of proof to the debtor, [Fed. R. Bankr. P.] 4003(c) does not change that allocation.").

[16] Montague Exs. A and B.

4

Judgment was recorded in the Kenai Recording District, where the Property is located, on August 27, 2013.

The following summer, the debtor quitclaimed his interest in the Property to Wallace Hansen on July 10, 2014.[17] The quitclaim deed was recorded the next day. As discussed in more detail below, the debtor asserts the Property was transferred in exchange for some financial assistance that Mr. Hansen had provided him. The debtor "moved off" the Property three months later, in October 2014, and has not stayed on the Property since.[18]

The next year, on July 16, 2015, a Notice of Judgment Execution Sale of Real Property was recorded in the Kenai Recording District, indicating that the Property would be sold at public auction on September 10, 2015 to satisfy the Judgment.[19] The Notice was posted on the Property on July 18, 2015. Thirteen days after the posting, a quitclaim deed transferring the Property from Mr. Hansen back to the debtor was recorded, but the debtor did not move back to the Property.

Ms. Montague says a state court hearing on the debtor's claim of homestead exemption was scheduled to be heard on March 30, 2016. The debtor filed his petition the same day, staying the state court proceeding. He did not live on the Property at the time of filing.

While this chain of events suggests some maneuvering on the debtor's part, it is not determinative on the issue that must be determined here: whether the debtor had a valid homestead exemption in the Property as of the date his petition was filed. The court will instead

---

[17] Montague Ex. C.

[18] The debtor's use of the property is discussed in greater detail in Section III.B.

[19] Mem. in Supp. of Obj. to Homestead Exemption, Ex. C (ECF No. 16-3), at 3-7.

5

look to the debtor's overall conduct with respect to the Property, and the facts and circumstances of his absences from that location, to determine the issue.

### B.   The Debtor's Story.

The debtor testified that he is "medically retired," but at one time he was a plumbing contractor in Anchorage. He said he has been injured since 2000. He stated that he has five fused vertebrae in his back, and also suffers from bipolar disorder. He is not currently living on the Property. In fact, by his own admission he hasn't lived there since October of 2014. Instead, he has been living in a rental property at 52144 Kasilof Beach Road ("Kasiloff rental") for $300.00 per month, continuously since October 2014.

The debtor's recollection is that he bought the Property in 2007. At the time of purchase, it was an unimproved parcel with no road access. The debtor said he excavated a road to the site, and then lived there in an old, insulated school bus while he built a house on it. He described the structure as a large A-frame, but also said it was a 24 by 24 foot building, with a small arctic entry. He testified that construction on the home had not ever been finished; the insulation and walls were never completed, and the roof leaked because a ridge cap was never installed. He said the structure had a Blaze King stove inside, which could bring the heat up to about ten degrees in the winter. His testimony as to the timing of these events and whether anybody had ever actually lived inside the house was inconclusive.

The debtor acknowledged that he had sued his sister, Ms. Montague, in a probate action in Washington involving their mother's estate, to try to "affirm my mom's word." He stated that he "failed," and that the action didn't work. He said the attorney who represented him, Mr. Flanigan, had given him a box of papers once the action was over, but he never looked at them, because, "I lost; it was done." This litigation resulted in the Judgment that Ms. Montague sought to enforce prepetition.

6

Sometime around 2011 or 2012 it appears the debtor acquired some real property in Anchorage, on Lake Otis Boulevard, with some money he received from his mother's probate estate. However, he testified that once he moved the old school bus to the Property, he lived there until 2012. He later qualified this assertion, recalling that he had rented his sister's duplex at one point, for one or two years. He explained that he had broken his wrist, and it was better living in the duplex so he'd have a place to cook and take a shower. However, he said he nonetheless went to the Property every day to work on it.

The debtor said both he and his wife were living on the Property in 2011 and 2012. He and his spouse had a tumultuous relationship. From the testimony, it sounded like the couple separated frequently. They are not currently living together. The debtor stated that he left the Property in late 2012 after he was served with a restraining order that his wife had obtained, and didn't return until the term of that order had expired.[20] He could not recall the duration of the restraining order, but said once he was served, he left the Property and lived at various rental properties located nearby.

The debtor initially testified that he returned to the Property sometime in early 2014, but later in the evidentiary hearing he said he returned in February 2013.[21] His wife left the Property

---

[20] The debtor described his wife as a dangerous person, and mentioned that he had at one time obtained a restraining order against her, as well. He accused her of obtaining the 2012 restraining order against him as part of her plan to liquidate his property. Yet, his testimony reflects that she has continued to be an occasional presence in his life. The debtor accompanied her to Philadelphia in mid-2015 for some medical treatment, and he said she stores some three-wheelers and "other stuff" at his Kasilof rental. He said that after he helped his wife with her medical issues, he tried to stay away from her, and last saw her on December 3.

[21] It was difficult to get a definitive timeline of events from the debtor. Early in the evidentiary hearing, he testified that he lived away from the Property for one and a half to two years after the restraining order was served, and didn't return until 2014. He later stated that his recollection had been refreshed through the questioning, and he recalled moving back in February 2013. However, this earlier date is suspect, because the debtor indicated his return to the Property coincided with the timing of Mr. Hansen's financial assistance. Mr. Hansen paid the debtor's 2014 real property taxes, and the quitclaim deed that conveyed the Property to him, in exchange for his financial assistance, was dated and recorded in July 2014.

Case 16-00076    Doc 32    Filed 09/29/16    Entered 09/29/16 13:53:51    Desc Main
Document      Page 8 of 15

sometime before this, though he didn't know when. On his return, the debtor discovered that the Property had been vandalized. The insulation, boiler, and water heater were gone from the house. Electrical wires had been cut. New LG appliances and hickory kitchen cabinets, still in their boxes and stored in Conex trailers on the Property, had been taken. Also missing were 120 sheets of brand new drywall, stored in one of the Conex trailers. Personal possessions, including his tools and mementos from his daughter, had been taken out of another trailer and were scattered around the Property, damaged by the elements. The debtor asserted his wife was responsible for much of the damage, but indicated that others had vandalized the Property as well. He wasn't sure exactly when the vandalism occurred.

Because the structure was uninhabitable, the debtor lived on the Property in a Safari RV that he borrowed from a friend. Between the time of his return and October 2014, he lived in the RV, but he said he would occasionally return to Anchorage "to get out of the cold" or "do other things." His friend also stayed in the RV. It is unclear when, or for how long, he was actually on the Property or would leave during this time period. When the friend decided to move the RV back to Anchorage in October 2014, the debtor moved to the Kasilof rental, where he is now living.

In July 2013, after the debtor says he had returned to the Property, the Judgment against him was entered in the Washington probate matter. As noted in Part III.A, this Judgment was recorded in the Kenai Recording District, where the Property is located, on August 27, 2013.

A year later, on July 11, 2014, the debtor quitclaimed his interest in the Property to Wallace Hansen. When asked why, he said he "was trapped in Anchorage. My dog had cancer, was dying." He said Mr. Hansen, a good friend, picked him up, paid the vet bills for his dog, and bought him food and other necessities. He also stated that Mr. Hansen "fired up the RV," but did not identify him as the person who lent him the Safari RV so he could live on the Property.

8

In addition to paying for food, necessities, and the debtor's veterinary bills, Mr. Hansen agreed to pay the back taxes on the Property.[22] The debtor said he quitclaimed the Property to Mr. Hansen in exchange for his generosity. The exact details of this arrangement remain elusive. Neither of them could put a dollar figure on how much financial assistance Mr. Hansen had actually given to the debtor. Mr. Hansen said he kept an accounting "in his head." When the debtor was asked about the significance of the quitclaim deed, he said, "I gave [Mr. Hansen] the Property. It's his." He said there were no strings attached to the quitclaim transaction, but there was an understanding that he had "first right to get [the Property] back."

Mr. Hansen testified that once the Property was conveyed to him, he paid to have the electricity put back on, and the debtor had his permission to go there to work on improvements. Mr. Hansen confirmed that the structure was uninhabitable, without water or power, at the time the Property was transferred to him. He said the debtor had planned on the Property being his retirement home, but had fallen on hard luck and he didn't want to see him losing it. He also stated that the debtor "built that place and did all the improvements that are there now."

Throughout 2015, the debtor lived in the Kasilof rental. In July 2015, Mr. Hansen quitclaimed the Property back to the debtor. In exchange, the debtor gave Mr. Hansen a 2005 Harley Anniversary Fat Boy motorcycle. The debtor testified that he purchased the motorcycle new in 2005, for about $18,200.00. He believed it was worth half that when he transferred his interest in it to Mr. Hansen, who indicated he thought it was a satisfactory exchange for the financial assistance he had extended to the debtor.[23] Mr. Hansen stated that this transaction was the debtor's idea, while the debtor said it was the idea of his attorney, Mr. Flanigan.

---

[22] Mr. Hansen said the Property had to be put into his name so he could pay the delinquent taxes, but couldn't explain why this was required. He couldn't say if he'd paid one or two years' worth of taxes, just "how many years behind, I paid."

[23] Mr. Hansen also had to pay about $1,300.00 to get the motorcycle released from storage, but nonetheless seemed satisfied with the transaction.

9

As noted in Part III.A, the quitclaim of the Property back to the debtor coincided with Ms. Montague's further collection efforts with respect to the Judgment. A Notice of Judgment Execution Sale of Real Property was recorded on July 16, 2015, which indicated that the Property would be sold by public auction on September to satisfy the obligation. The debtor testified that Mr. Flanigan suggested the July 2015 quitclaim of the Property be done "as part of his case" with Ms. Montague. His recollection on this point was fuzzy. However, this transaction occurred around the time the debtor took his wife to Philadelphia to receive medical treatment for a serious illness. He said he went there twice in 2015, once for about 10 days and a second time for around 34 days.

The debtor testified that no one has lived on the Property since October 2014. He has occasionally returned to the Property to make sporadic improvements. He said there is very little work being done, because he does it all himself and "it's nickle and dime." He said he has been working on fixing the sewers, and has also dug a 30-foot ditch to try to locate the break in the water service. He said he's "started a hole, but that's about it." He also said he has been working on a power problem with the well, and has cleaned up the interior of the home a bit.

It appears that vandalism to the property has been ongoing. The debtor stated that the utilities to the property were vandalized in the last couple of months, in that power wiring had been cut, which was very dangerous. He said he had "ATA" come out and secure the wires so no one would get hurt.

The debtor has resided in the Kasilof rental continuously since October 2014, when his friend moved the RV back to Anchorage. His clothing, his two dogs, and some of the personal effects he was able to save from the Property are also located there. He also indicated his wife is using the yard around the rental for free storage, and has left some three-wheelers and "other stuff" there. His rental unit is just 20 by 20 feet, with no running water or bathroom. To eat, the debtor says he has to either barbecue or dine out, which gets expensive.

10

When asked what improvements he had made to the Property since January 2016, the debtor said he'd been working on the power issue with ATA, electrical for the well, and "digging a hole." He didn't have receipts for any parts or materials that he might have used in connection with these improvements. He said he has spent about $200.00 for fittings and glue. He estimates that wiring to the well will cost about $1,000,00, but he hasn't purchased that yet. He said he acquired a "wood burner" for winter by helping someone else clean up their property, and explained that this was an important item, because "you need to be warm." He further stated that, "Right now, I am working on fish; I got a container to smoke fish in," so he would have food during the winter.

The debtor has not stayed on the Property at any time in 2016. He said he couldn't live in the structure there because "pretty much everything you could use is gone," although "you could camp there." The structure itself would be too cold; the insulation and roofing needed to be done before it could be lived in. Post-petition, he has purchased an Airstream trailer from a friend, which he has placed on the Property.[24] In response to questioning from Ms. Montague's attorney as to why he purchased the Airstream, he responded, "After I found out I was supposed to be living there, because of you."

The debtor said he planned to put his wood burner into the Airstream and move to the Property. But he didn't live there yet, explaining "I need to go fishing now, need food for winter." He also said he didn't "know if I'm gonna be there or not;" it depended on "what happens here." If he is permitted to keep the property, his plan is to have a greenhouse to grow food, and hunt "right in my yard." However, he conceded the frequency of his visits to the Property depend on his physical and mental well being. He said going there was "extremely depressing with the mess there, and all the things that my family has done to me there." He

---

[24] He said the price for the Airstream was $1,200.00, but a friend gave it to him and he will pay him $150.00 per month to buy it.

11

explained that he plans to stick with it, though, stating, "I do intend to go there, finish, because that's what I do, I finish stuff."

The debtor estimates at least $10,000.00 to $20,000.00 needs to be put into the Property, depending on the labor costs, to make the structure habitable. Additionally, real property taxes are owed to the Kenai Peninsula Borough for tax years 2015 and 2016. When asked why he doesn't put more money into the property to fix it up, given his pension and SSI income, the debtor said he is juggling too many other things. He said his car needs repair, he is focused right now on fishing for winter food, and is trying to pay for other things in his life.

## IV. The Debtor Has Failed to Establish "Actual Occupancy on a Regular Basis."

The debtor has the burden of establishing the validity of his homestead exemption by a preponderance of evidence.[25] The evidence in this matter is comprised almost exclusively of the debtor's testimony. While the court finds the debtor to be sincere, his testimony lacked internal consistency. It failed to provide sufficient detail to assist the court in fully understanding the debtor's use of the Property and the chronology of events. Despite the debtor's testimony, the court remains uncomfortable with the details of the improvements on the Property and the timeline overall. Yet, the evidence is clear that he has not lived on the Property since October 2014, after he conveyed the Property to his friend, and ultimately recovered the Property. Even prior to that time, any time he has spent on the Property has been transitory, punctuated with substantial periods during which he has lived off the Property. This has been attributable to the absence of a permanent inhabitable improvement on the Property; the debtor's time spent living on the Property has been in various vehicles moved onto and off the Property.

The debtor says he purchased the land in 2007 and has lived there ever since while building his house. This seems to be a perception rather than a reality. Sometime prior to 2011, the debtor lived in a duplex rented from his sister, after he broke his wrist, for roughly two years.

---

[25] AS 09.38.075(f).

12

He testified that he and his wife lived on the Property in 2011 and 2012, but after he left the Property in late 2012 to comply with a restraining order, the time he has spent at the Property has been sporadic. The debtor lived in an RV on the Property sometime between February 2013 and October 2014, but he came to Anchorage frequently to "get out of the cold" and do other things. These actions, the accommodations utilized to stay on the Property, and his departure again from the Property, all cut against a finding that he actually resided on the Property. Fundamentally, it is unclear to the court that the debtor has ever established an actual residency on the Property, though it is clear that this was he ultimately planned to do.

     Even if the court were to find that the debtor had actually resided at the Property and established it as his homestead prior to 2014, the court finds that his voluntary conveyance of the Property and departure terminated his residence. Since October 2014, the debtor has lived in the Kasilof rental. He has returned to the Property sporadically. Even though he says he has now moved an Airstream trailer to the Property, this occurred post-petition and the debtor still was not actually living there at the time of the evidentiary hearing. Moreover, he says he's not sure if he will be there or not in the future because it is depressing for him to go there. He says he wants to finish the house and live there, because "that's what he does, he finishes things," but not because it's his home. Both his actions and intentions are contradictory, and do not reflect a consistent intent to treat the Property as a homestead. Indeed, the one event that is clear from the record presented is the quitclaim transfer of the Property to Mr. Hansen. Although one can view the transfer as akin to security for repayment, the amount and existence of a debt were never formalized, and the conveyance was unconditional on its face. The court is unable to reconcile the transfer with his stated declaration of homestead.

     The court is sympathetic to the debtor's overall circumstances, and is mindful that exemptions are to be liberally construed. The court also recognizes the debtor's stated intent to move onto, and live on, the Property, and that he has provided the court with some evidence of

13

his efforts to do so. But, to establish a homestead exemption, Alaska law requires "actual occupancy on a regular basis,"[26] at least at some point in time. The evidence presented at the hearing failed to show that the Property was the debtor's "true, substantial, and real residence" on the date of the petition.[27] Indeed, the court is not convinced that the debtor has ever "resided" at the Property under this definition, though he would like to do so in the future if he can find the means to build a house.

Importantly, the debtor voluntarily conveyed the Property to his friend in July, 2014, and moved off the Property shortly thereafter when he lost the use of the RV that he was living in.[28] The debtor did not pay real property taxes on the Property for some period of time prior to conveying it to his friend because the friend brought the taxes current while he owned it. Since then, the Kasilof rental has been the debtor's primary residence. His personal effects are there, his pets are there, and even some of his estranged wife's belongings are there. The debtor has

---

[26] *Ilardi v. Parker*, 914 P.2d at 891.

[27] *Id.* at 890-91.

[28] This distinguishes the debtor's case from those where the debtor's absence is involuntarily. *Contrast In re Diaz*, 547 B.R. 329 (B.A.P. 9th Cir. 2016)(debtor unable to return home due to illness, but left all of his property at the home); *In re Foster*, 348 B.R. 58 (Bankr. E.D.N.C. 2006) (debtor residing in camper when house was destroyed, but continued to pay property taxes, and had plan to hire a contractor and use her son's financial assistance to rebuild house). Even accepting that the debtor was forced to leave the Property due to marital troubles with his wife, his conveyance of the Property and departure in October 2014 (together with keeping his property in the Kasilof rental) were voluntary acts. His situation is more akin to that of the debtor in *In re Dobson*, 1 A.B.R. 459 (Bankr. D. Alaska 1991), who liquidated other assets to pay down his boat mortgage, and moved onto his boat, prior to filing bankruptcy, for the purpose of claiming a homestead exemption in that asset. However, the debtor continued to pay monthly rent for a room in a zero lot line residence that he had occupied for a number of years prior to filing bankruptcy, and where he stored many of his personal possessions. He also "house-sat" at the rental property several times postpetition. The court denied his homestead exemption, stating that it "did not believe that the debtor had a bona fide intention of making the boat his permanent residence at the time of filing." *In re Dobson*, 1 A.B.R. at 463. Similarly, in *In re Black*, 9 A.B.R. 8 (Bankr. D. Alaska 2008), the debtor's homestead exemption was denied because she had not lived on the subject property for several years, but instead had resided in a rental property with her boyfriend. Further, the trailer on the claimed homestead was "rotten," the septic tank did not work, and the property was overgrown and dilapidated. The debtor had tried to sell the property for ten years prior to filing bankruptcy, and sold it on the eve of filing. The court readily concluded that the property was not her "actual dwelling place," and denied the homestead exemption. *In re Black*, 8 A.B.R. at 9.

14

not paid real estate taxes since the Property was transferred back to him. In short, the Property was not the debtor's actual dwelling place at the time he filed his petition, and, therefore, does not qualify as his homestead exemption.

For these reasons, the court will sustain Ms. Montague's Objection and deny the debtor's homestead exemption. An order will be entered consistent with this Memorandum.

DATED: September 29, 2016.

BY THE COURT

 /s/ Gary Spraker
GARY SPRAKER
United States Bankruptcy Judge

Serve: M. Joyner, Esq.
M. Boutin, Esq.
N. Jipping, Trustee
U. S. Trustee
SVS

15